Good morning, Counsel. Good morning, Your Honors, and may it please the Court. My name is Jesse Kodatek, and I represent the plaintiff and appellant Lola Liquor, the owners of which are here today in the audience. And I would like to reserve four minutes for rebuttal. All right. Your Honors, consistent, unbroken, controlling case law from the Supreme Court and from this circuit shows that as a matter of law, and this is a purely legal issue at this point, Lola Liquor is likely to succeed on the merits of its contract clause claim. There are two reasons for this, which the state argues both of these, so I will go with those two elements in turn. First of all, from a contract clause perspective, there's no question that we have a contract here. The second issue is a contract which acknowledges that the state can change the rules of the game, right? No, not in this context, Your Honor, and let me explain why. If you look at the very front page of the Agency Franchise Agreement, which is at ER 70, Section 2 talks about how the Commission can be changed. Specifically, the third clause of this section says that during the term of this agreement, the Commission percentage discount rate may be reviewed every three years as provided by law. Helpfully, that clause cites to a specific statute. If you look at ER 90, this is the Senate Bill 193 is passed, so the language that is struck out is the language that existed at the time Lola Liquor entered into the contract with the state, and it says the Commission percentage rate may be reviewed every three years at the request of either party. If the agent concurs, the department may adjust the Commission rate. So, a plain reading of the contract shows, in connection with the statutory language cited therein, shows that the Commission rate can only be changed if the agent concurs. No agent would ever concur to have its Commission rate lowered. The state admits that, other than one franchisee that went bankrupt and had new owners or something, no agent has ever had its Commission rate lowered during the term of one of these 10-year periods. The reason that it can be adjusted in favor of the agent is prior to the enactment of Senate Bill 193, and the reason our clients bought this liquor store is because they knew that they had a guaranteed Commission rate, and the reason it can be adjusted is because the different liquor stores in the state are not situated the same. Lola Liquor is in Lolo, Montana, which has 3,000 people. There's no foot traffic there. There's cars that drive by, but it's not in an urban Montana context situation, and the big difference is that there's two methods that these agency liquor stores can sell alcohol, and one is wholesale to bars, which, and just let me clarify something because I know your honors are from different states. When you go to Montana, the only places you can buy liquor are at one of these 96 agency franchise stores or at a bar, essentially. So you'll drive around and you'll see these bars and casinos, and you can purchase on-sale liquor there for consumption on the premises, and they also, if they choose, can sell off-sale liquor. So all of that liquor, though, goes through these 96 agency franchise stores. The franchise stores are compelled to sell to these bars at a fixed wholesale cost that is set by the state. In contrast, for retail sales to the general public, they can set whatever price they want. So, for example, you have agency stores in downtown Missoula and in downtown Billings and places like that that have significant retail sales, and they can set whatever price they want. So the reason that these different stores had different arrangements and were allowed to negotiate with the state, and that's really what this is, this is a negotiated commission percentage. It is not set by statute in total. In part, it is, but you can read the statute and you will not be able to figure out a way that Lola Liquor got to a 16.144 commission rate. It's negotiated. And so the purpose of that is to put these more rural stores on a sort of an equal footing with the urban stores because they don't make as much money when they sell wholesale. So they'll never match. If Lola Liquor sells the same amount of liquor at wholesale as a Missoula store sells at retail, the Missoula store is going to make significantly more money. That's why these are different. The Montana Senate bill your clients are concerned with has an effective date of February of this year, is that right? Yes. Let's assume you're absolutely right on your contract argument. Why can't you prove up damages at trial? Or maybe better stated, wouldn't you be able to effectively show the trial court the damages your client has sustained in a full-blown trial? Yes and no. To some extent, the damages that are accruing right now every day since February 1st, we can calculate those. However, our client's business plan is a wholesale market and they need to determine how to order their business and whether they want to go seek out new customers. And when they're selling to these various stores at a fixed rate, is it worth it for them to drive from Lolo, Montana to Eastern Montana, which I would note is they can drive to Seattle from Lolo quicker than they can drive to Eastern Montana from Lolo. So their business is ordered and sort of defined by their commission rate. And this potential loss of customers harms the goodwill of the business. And this court has held that, and these cases are cited in our brief, that loss of goodwill is irreparable harm or can be irreparable harm. I know it's better for your clients to have it with the other way, but in terms of we're evaluating the standards that we're looking at on a preliminary injunction, right? So the court only analyzed that you were likely to lose on the merits, right? It's a rather cryptic order, yes, Your Honor. Well, but let's just say we, if we agree that that isn't so clear, it would then have to go back to the district court to analyze those other factors because the court didn't get to the other factors. So you could still lose, right? Yes, Your Honor. I mean, we can't, you're not, you can't, I mean, for you here to win would be a remand to go back and look at the others, right? No, Your Honor, and I think that this court can remand for the entry of a preliminary injunction, and there's a couple reasons why. First, to go back to the irreparable harm issue, most court... We don't, we don't generally analyze that in the first instance. Well, in terms of a violation of a constitutional right, most courts hold that the violation of a constitutional right is irreparable harm for the purposes of a preliminary injunction. I also think it's worth noting that the state has never argued that we did not meet the other injunction factors, and I think the reason for that is pretty simple. The balance of the equities obviously tips in Lola Licker's favor because the state will not face a hardship merely by living up to its contractual obligations, and in contrast, there is a significant or massive hardship for Lola Licker to proceed for an unknown period of time based on a contract that the state has essentially torn up, and I would also point out that there's one other... So, but what would be the, since there was a condition in there that put you on notice that the discount rate could be changed by the legislature, what would be a condition that would survive your challenge? You say this one doesn't, but what would be a condition? In terms of the commission rate or other changes, your honor? Well, it said the contract with the state contains a provision stating that any change in the Montana law may be effective immediately, notwithstanding the failure of a party to agree in writing to the change. There's a lot of things that have changed, including during this legislative session, for example, the contract says the only place that agency franchise stores can get their liquor is from the state liquor warehouse. Well, there's all these micro distilleries... So, no change in the discount rate could ever survive that? Not unless the agent concurs, your honor. And I, can I point out that in Southern California gas, there was a general, which I really think is controlling, and the court doesn't need to look much beyond Southern California gas in the University of Hawaii case. In the Southern California gas case, there was a general modification provision, like the one in section 11 here, that said, you know, changes to the law may require changes to this agreement. By the time that case got here, that contract was 60 years old, and the court still held that it was not, it could not be changed because it went to the central part of the agreement. Well, when you look at the central part of the agreement in that case, it was to deliver gas to the city and to the residents of the city. This trench cut ordinance in that case was really a collateral issue. When you look at this contract, the very central term of the entire contract is this commission rate. I mean, really the contract promises two things, the right to sell, to buy liquor from the state, to sell to bars and the public, and the promise of that commission rate. It really is the center of the agreement. And the reason the contract clause exists, Your Honor, and I think the Supreme Court recognizes in U.S. trust, which is also very much controlling here, we believe, is that if the state could simply change the law and modify its contracts at will, it would be an illusory contract because there would be no consideration. Why would people, why call it a contract if they're not obligated to live up to their expectations? This isn't a contract in perpetuity. For the purposes of our we're only talking about for the remainder of this 10-year term, which is also on the front page, you know, that talks about the agreement. So I think, Your Honors, that the state should be held to its agreement based on both the plain language of the agreement and based on U.S. trust and based on Southern California gas. I'd like to reserve my time. All right, thank you, counsel. May it please the Court, my name is Andy Forsyth and I represent the state of Montana. Chris Sweeney is here with me and I would like to split my time and give Chris some time after I've talked for about seven or eight minutes, if that's all right with the Court. So are you going to be the one to talk about distinguishing the impairment of contract found in Southern California gas? I would be happy to address that. Okay, well I think that's what he seems to say puts the nail in your coffin, so if you would distinguish that, if you can, I would like to hear that. So I think that we have sort of a competing view of controlling cases. We cite and encourage the Court to consider Energy Reserve, which is the United States Supreme Court case, and they, of course, urge on you the Southern California case. The case, I think, is distinguishable through an analysis of the reasonable expectation of the parties to the contract. So factors that bear on reasonable expectation of the parties, which determines whether there's a substantial breach, what did the We think this case is easily distinguishable from the Southern California case. In the Supreme Court's decision in Energy Reserve, they cite the provision that provided for a possible future change in the law as a consideration in determining the reasonable expectation of the parties. Similarly, this Court, and I'd like to mention a case, if I may, that is a Ninth Circuit decision, but didn't make it into our brief, for which I apologize. RUI-1 versus City of Berkeley, 371 Fed 3rd 1137, decided a year after the Southern California case, and there the Court said, looking at the agreement that the private party had with the municipality, the City of Berkeley, had a provision that said this agreement will be modified by future changes in the law, and the Court said that would be a factor in determining reasonable expectation. One of the things that, two other factors that the Court has noted, both the U.S. Supreme Court and the Ninth Circuit, in considering reasonable expectation, is the length of the contracting relationship and whether the contract involves an area of business that is heavily regulated. So in Southern California, the Court made prominent note, actually I believe Southern California argued the length of the Southern California practice of not having to pay for extra road repair in that case, as a factor determining Southern California's reasonable expectations. The Court pointed out that for over 50 years, Southern California had paid their contract rate, despite the fact that their agreement said it would conform to future changes in the law. And that gave them a expectation that that term would continue without change. But in Energy Reserve, and in RUI 1 v. Berkeley, a Ninth Circuit case, and then we cite an Eighth Circuit case, Hawkeye, in our briefs, and for the Ninth Circuit case, when a contract includes clear language providing that the terms of the contract can change for future legislation, this can determine the reasonable expectation of the parties. Another factor, after considering contract language, is whether the business is in a heavily regulated environment. Why can't the state wait to enforce these changes in the law? Well, I think, I mean, the first... It's a flip of the question I asked your opponent. Right, yeah. You know, I think the first obvious... It seems that the damages, the loss, if there is to the state in this case, can be readily determined at a full-scale trial. State has a lot more money than the owners of this particular rurally located liquor store. Why not wait? You know, I think that the state, to begin with, certainly the executive branch, feels an obligation to implement and enforce the law as given to it by the legislature, and so I'd point out that the... And I think an interesting point to make in the argument would be to refer to, and we don't have much of a record in the case, we're barely into the litigation before it was... Well, you know, if it was taxes, you would have a very unique executive in I know these are not taxes, but again, why not wait? Well, actually... Well, it seems to me that there's got to be some money advantage to the state because what Judge Hawkins is saying, you're spending all this money litigating it, and they could have just applied it to new or renewed tenure contracts. The... Well, the... I think the state feels an obligation to implement the legislation because the legislation was not for the purpose of increasing state revenue. The state is reduced under this change in the law. The state makes less money once... So what's... So what's the reason? Not from this franchisee, but from the others. So why can't you wait? Well, why can't... Instead of having to... How long would you have to wait? Not that long. Yeah. Well, if we... Yeah. If we lift the stay in the court below, I think we can litigate this out to conclusion pretty quickly, and that would be a good thing to do. But if... May refer you briefly, though, to ER 96, and you may not have it before you, but this is an exhibit created by the plaintiffs here, which shows the effect on the 96 franchises in Montana of the new legislation. A key goal of the new legislation was to actually level the discount experience of the various competing franchisees. And a quick look at the numbers that the plaintiffs have provided shows the net or foregoing revenue to make the percentage discount the franchisees get. Whose fault is it that it's not equal? It's the state entering into all these different contracts, right? Well, this... Under the old law. The... Well, yeah, but it's the state's fault, and so now someone else has to be harmed  Well, the state agreed... Well, it's the legislature that said, yes, we will level the playing field among franchisees. It was unfair to have such a broad range of discounts. Looking at Lola Liquor's own exhibit, they had the highest discount in Montana among the 96 franchisees, and high volume. So under the new approach, their discount, the spread between what they pay for a case of liquor and what they must sell the case for to a bar or restaurant, is going to be much closer, or over three years, equal those franchises that have about the same volume. So that's the purpose of the act. It wasn't a revenue-generating purpose. But is it the fault of the legislature and the state that the law changed? Well, sure, they changed the law. Well, it's not like it's not... Someone's not going to die, right, here. It's not... You know, sometimes you have things that have to go into effect right away, because there's some horrible public danger. Mm-hmm. Yeah. But I think you can understand that the executive branch, looking at this as, Lolo, you should be where your competitors in Missoula, the town next door, are, not with your special deal. I don't think the executive branch feels free to say, oh, we can simply decide to make an exemption of the law for this particular business. What's the mileage definition of next door? Well, here, Lolo's only eight or ten miles from Missoula. So in Montana, that's next door. So let me mention, unless there's another question, mention a couple of points I'd like to raise. We're really here to review Judge Haddon's decision on an abuse of discretion standard, and he offered one rationale. That is, in his view, plaintiffs were unlikely to succeed on the merits. He didn't give us much of an explanation for that. But while law would be reviewed de novo by this court in reviewing a preliminary injunction order, facts would be given deference. At least he identified a rule that's a genuine rule, and that is likelihood of success on the merits. And in his judgment, under the facts of the case, it was low. The two key factors we think make the likelihood of success low are that the contract is very clear in telling this franchisee who's had the contract for two years, not the 50 years that Southern California Gas had, very clear in telling them that changes in the law immediately result in changes to the contract. The second factor is that this purchaser two years ago, this franchise, entered into a, I would say, not just a heavily regulated business, but a totally regulated business. In Montana, there are only 96 franchises. The key benefit to a franchisee isn't the discount rate. It's the fact that the number of franchises are strictly limited. And so that it is very much in the form of a limited license opportunity to wholesale and retail liquor products. And I'm going to relinquish the podium in a moment to my colleague, Chris Sweeney. But I would like to direct the court's attention to Energy Reserve, which is a US Supreme Court case, and Allied Structural Steel, a Supreme Court case. In Energy Reserve, the court noted that the business was in sale of natural gas. The price of natural gas had been regulated for years. When the regulation changed, it was a reasonable expectation of the parties that they would be subject to these changes in regulation. And I'll quote just briefly from that case. In determining the extent of the impairment, we are to consider whether the industry the complaining party has entered has been regulated in the past. And here, of course, not only is everything regulated, but if you look at the franchise agreement, each paragraph in the agreement is followed in parens by a cite to the Montana Code section that is the source of that term in the agreement. Everything in the agreement is simply a recitation or rephrasing of the statute itself. So it can't be a surprise that at the end of the agreement, it says, you know, in clear terms, this agreement, any change required by a change in Montana law will be effective immediately upon the effective date of such change in law, notwithstanding the failure of a party to agree in writing. It's really telling these new franchisees who entered their agreement two years ago, everything in your agreement is based on a state statute, and if the state statute changes, so will your agreement. I see there are three minutes left. I should have been more generous. May I ask my colleague, Chris, to offer some thoughts? All right. Thank you, counsel. Thank you, your honors. I have just two points to make. The first... First, introduce yourself for the record. Sure. Chris Sweeney on behalf of the defendants. Just two quick points. My colleague, Andy Forsyth, did a very nice job of wrapping up the state's position. The first is with respect to the language in the agency franchise agreement. I understand the plaintiff's position to be that the modification provisions somehow are inconsistent or in conflict with one another. The modification provision on page one references the statute and says that the terms of the contract can change with future renewals of the agreement. Section 11 of the agreement states that the contract will change automatically and immediately to conform to changes in Montana law. These are not inconsistent, nor are they in conflict. The modification provision on the first page provides one means to modify the terms of the agreement. The modification provision in section 11 on page 14 provides another means. This was a term that the plaintiff agreed to. The plaintiff is asking you essentially to write this out of the agreement, but we don't think that they are in conflict and can be reconciled quite easily. The second point I would make is with respect to contract clause analysis in general. We all know that the three prongs of contract analysis first require the finding of a contract, second is the finding of a substantial impairment, and third, whether there's a reasonable basis for the new law or whether it's reasonably related to a legitimate government purpose. The point I would make and the point the plaintiffs make in their brief is that when the state is a party to the agreement, as the state is a party to the agency franchise agreement in this case, heightened scrutiny applies. I think we need to be careful and refine exactly when heightened scrutiny does apply. This court's case of RU1 versus Berkeley states when the state or government entity is a party to the contract, heightened scrutiny only applies to the last element of contract clause analysis, that is, whether the law was reasonably related to a legitimate government purpose. Heightened scrutiny does not apply to the second element of whether there was a substantial impairment in the first place, and I think that's very important for one reason. Energy reserves did not have a government party to the contract, but it laid down the industry and agrees in that agreement that it will be subject to future laws, that party cannot immune itself from future laws. What page of RUI1 were you referencing when you were talking about the heightened scrutiny? I'm sorry. My partner has the case here, and while he's looking for that, perhaps I will keep talking and we will get back to that. I will also say... I have a question. Sure. Let's assume this case goes back in its current standing with no preliminary injunction, and LL Liquors prevails. Would they be entitled to recover their fees? I would have to look to see if they've asserted a claim for attorney's fees. I'm sure they have, but I'm not prepared to answer that because I don't think we've brought that issue up quite yet. Okay. And you were about to give... Sure. Absolutely. So I am looking at page 1152 of RUI1, the City of Berkeley, 371F3D1137. Okay. Thank you. You are welcome. So just to sum up, the point I am making is the fact that there was not a government party as a party to the agreement in energy reserves is not distinguishing in this case because this court's decision in RUI1 versus Berkeley makes clear that it doesn't matter which party or whether the government is a party with respect to determining if there's a substantial impairment. All right. Thank you, counsel. Rebuttal? Your Honors, as my colleague correctly noted, the energy reserves case that they spend the majority of their briefing focusing on was about a contract between private parties. It's a very different standard than a contract to which the state is a party. I also... I didn't really address the reasonableness issue earlier and I'd like to just address that real quick. In the University of Hawaii case, this court said that an impairment is not a reasonable one if the problem sought to be resolved by an impairment of the contract existed at the time the contractual obligation was incurred. And so what that means is the idea that different stores had different commission rates somehow justifies changing the contract now doesn't make any sense because that was there two years ago. That's why the time frame, the shorter time frame here supports Lola Licker's case rather than hurts it. The other thing I want to say is they're trying to distinguish case law, but I really don't think they can do it. As your Honor, Judge Callahan mentioned earlier, in terms of likelihood of success on the merits, that is a purely legal issue. We don't have any disputed facts. That's the one thing we agree on. It's a purely legal issue. And since 1977, neither the Supreme Court nor this circuit has ever allowed a state entity to impair the obligation of its own contract, regardless of a modification provision. And this is simply not, there's no justification for it here. So Counselor, do I understand you to say that even if there is a modification provision in the contract, the state nevertheless is prohibited on the contract clause from impairing its contract? I think there may be circumstances where it's okay, but that has not happened in any case that we're aware of since U.S. Trust in 1977. And the modification provision in Southern California Gas is really similar to the modification provision in Section 11 here. But when you look at the, and that wasn't good enough for this court. And when you look at the modification provision on the front page of the agreement, it says the commission rate can only be changed if the agent concurs, if the franchisee concurs. Why would a franchisee ever concur to have its rate lowered? It would not. And it just, it's, there's no rationale that they've set forth that justifies the impairment. They say in their brief, and I give them credit, that maybe once you find an impairment, you can say, well, maybe they're going to come up with some justification that's good enough later. Well, that's fine, but until they do, I think as a matter of law, Lola Liquor has met the elements necessary for a preliminary injunction. Counsel, does it matter in this case that the, that the legislature changed the law as opposed to the commission changing the regulation? Does that matter in this case? I'm sorry, the commission? It wasn't at the Liquor Commission. What is it, the entity that, that signed the contract? DOR. It was the Department of Revenue. Of the Department of Revenue. Mm-hmm. No, I mean, I think if I understand your question correctly, Your Honor, it's okay to change, the DOR, because this is a negotiated commission rate, they, if the parties agree, then by the plain language of the contract, it's okay to adjust the commission rate during the term of the contract. And that apparently has happened in the past, but it's never been adjusted down. But, but it was the legislature in this case that changed the law and not the Department of Revenue that promulgated a regulation, which would be a more direct impairment of the contract. Do you think that makes a difference? I mean, I think you're, no, Your Honor, because if anything, I think it helps our case because the plain language of the contract clause says no state shall pass any law impairing the obligation of contract, which is exactly what happened here. So, and when you look at the purpose of, the original purpose of the contract clause was to prevent majoritarian tampering with contracts, and it actually was aimed at private contracts way back when, when the constitution was ratified, but it's come to protect public contracts even more for the reasons discussed in US Trust and Southern California Gas, that if the state can simply pass a law to change its financial obligations whenever it feels like it, it's really not a contract and it's an absurdity and the contract is illusory. Real quick question. Can you answer my question on whether if you prevail at trial, your client would be entitled to recover its reasonable attorney's fees? Absolutely. Yes, Your Honor. That's all I need to know. All right. Could you sum up, counsel? Yes. So, once again, I know I'm harping on this, but I really think that the facts of this case... If you're harping on it, it means you're repeating yourself. All right. The fact that really cannot be distinguished from Southern California Gas, the modification provision there was general, like the one in section 11 here, specific contractual provisions as a matter of Montana state law, and I assume federal common law, control over general provisions of contracts. And if the government claims it might eventually develop rationale supporting the justifying the impairment of this contract, that's fine. It can try, but it's going to have to clear a hurdle that no government entity has been able to clear in the Supreme Court or in this circuit since 1977. For some reason, I thought that in Southern California Gas, the exact same entity that was the party to the contract, the city, passed a law that I thought that was the distinguishing feature. Is that... Am I wrong in my recollection of that? No, Judge Rawlinson. You're correct. It was a municipal ordinance in Southern California Gas, but it was... I think there's a logical relationship. It had the police power over that issue in terms of who could cut trenches and streets. So it was exercising its police power over its municipal affairs in the same way that the legislature here is purportedly exercising its police power over the Department of Revenue and taxpayers and the liquor distribution system. All right. Thank you, counsel. Thank you to both counsel. The case just argued is submitted for decision by the court.
judges: Hawkins, Rawlinson, Callahan